## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION AT DAYTON

| | | |
|---|---|---|
| AMBER N. BRANDENBURG, | : | Case No. 3:16-cv-442 |
| | : | |
| Plaintiff, | : | |
| | : | |
| | : | District Judge Walter H. Rice |
| vs. | : | Magistrate Judge Sharon L. Ovington |
| | : | |
| NANCY A. BERRYHILL, | : | |
| COMMISSIONER OF THE SOCIAL | : | |
| SECURITY ADMINISTRATION, | : | |
| | : | |
| Defendant. | : | |

## REPORT AND RECOMMENDATIONS[1]

I.      **Introduction**

Plaintiff Amber N. Brandenburg applied for period of disability and Disability

Insurance Benefits on August 23, 2013 and applied for Supplemental Security Income on

October 18, 2013, asserting that as of May 31, 2011, she could no longer work a

substantial paid job due to post-traumatic stress disorder (PTSD), bipolar disorder,

anxiety, depression, and insomnia. The Social Security Administration denied Plaintiff's

claims initially and upon reconsideration. At Plaintiff's request, Administrative Law

Judge (ALJ) Benjamin Chaykin conducted a hearing where both Plaintiff and a

vocational expert testified. Shortly thereafter, the ALJ concluded that Plaintiff was not

eligible for benefits because she is not under a "disability" as defined in the Social

---

[1] Attached is a NOTICE to the parties regarding objections to this Report and Recommendations.

Security Act.  Plaintiff brings this case challenging the Social Security Administration's denial of her applications for Social Security benefits.

The case is before the Court upon Plaintiff's Statement of Errors (Doc. #7), the Commissioner's Memorandum in Opposition (Doc. #9), Plaintiff's Reply (Doc. #10), and the administrative record (Doc. #6).

Plaintiff seeks a remand of this case for payment of benefits or, at a minimum, for further proceedings.  The Commissioner asks the Court to affirm ALJ Chaykin's non-disability decision.

## II.  Standard of Review

The Social Security Administration provides Disability Insurance Benefits and Supplemental Security Income to individuals who are under a "disability," among other eligibility requirements.  *Bowen v. City of New York,* 476 U.S. 467, 470 (1986); *see* 42 U.S.C. §§ 423(a)(1), 1382(a).  The term "disability"—as defined by the Social Security Act—has specialized meaning of limited scope.  It encompasses "any medically determinable physical or mental impairment" that precludes an applicant from performing a significant paid job—i.e., "substantial gainful activity," in Social Security lexicon.  42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A); *see Bowen,* 476 U.S. at 469-70.

Judicial review of an ALJ's non-disability decision proceeds along two lines: "whether the ALJ applied the correct legal standards and whether the findings of the ALJ are supported by substantial evidence."  *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009); *see Bowen v. Comm'r of Soc. Sec*., 478 F.3d 742, 745-46 (6th Cir. 2007).  Review for substantial evidence is not driven by whether the Court agrees or

disagrees with the ALJ's factual findings or by whether the administrative record contains evidence contrary to those factual findings. *Gentry v. Comm'r of Soc. Sec.*, 741 F.3d 708, 722 (6th Cir. 2014); *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007). Instead, the ALJ's factual findings are upheld if the substantial-evidence standard is met—that is, "if a 'reasonable mind might accept the relevant evidence as adequate to support a conclusion.'" *Blakley*, 581 F.3d at 407 (quoting *Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 390 (6th Cir. 2004)). Substantial evidence consists of "more than a scintilla of evidence but less than a preponderance . . . ." *Rogers*, 486 F.3d at 241 (citations and internal quotation marks omitted); *see Gentry*, 741 F.3d at 722.

The other line of judicial inquiry—reviewing the correctness of the ALJ's legal criteria—may result in reversal even when the record contains substantial evidence supporting the ALJ's factual findings. *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 651 (6th Cir. 2009); *see Bowen*, 478 F.3d at 746. "[E]ven if supported by substantial evidence, 'a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.'" *Rabbers*, 582 F.3d at 651 (quoting in part *Bowen*, 478 F.3d at 746, and citing *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 546-47 (6th Cir. 2004)).

III.  **Background**

Plaintiff asserts that she has been under a "disability" since May 31, 2011. She was thirty-two years old at that time and was therefore considered a "younger person"

under Social Security Regulations.  *See* 20 C.F.R. §§ 404.1563(c), 416.963(c).  She has a high school education.  *See* 20 C.F.R. §§ 404.1564(b)(4), 416.964(b)(4).[2]

## A.    Plaintiff's Testimony

Plaintiff testified at the hearing before ALJ Chaykin that she has struggled with mental health problems for approximately fifteen years on and off.  (Doc. #6, *PageID* #87).  She has been diagnosed with bipolar disorder, PTSD, and anxiety disorder.  *Id.* at 91.  She also has black-out periods where she cannot remember what she did.  *Id.*  In 2013, she began seeing a psychiatrist, Dr. Agarwal, every two to three months.  *Id.* at 87-88.  In addition, Plaintiff sees a therapist every week or at least twice per month.  *Id.*

Plaintiff takes several medications for her mental impairments:  Seroquel as a mood stabilizer, Ativan for anxiety and panic attacks, and Doxepin to help her sleep.  *Id.* at 89.  Plaintiff explained that the medication helps but "also hinder[s] [her] too because they're very high dose." *Id.* at 88.  She experiences two primary side effects:  "Sometimes I get dizzy.  Sometimes I get drowsy." *Id.*  She feels dizzy approximately four times a week and has to sit down for thirty to forty minutes before she can stand again.  *Id.*  She gets drowsy every day.  *Id.* at 89.

Although Ativan helps reduce the number of panic attacks she has, it does not prevent them completely.  *Id.*  Plaintiff estimated that she has three panic attacks per week.  *Id.*  When she is having a panic attack, her heart starts racing, she gets hot and

---

[2] The remaining citations will identify the pertinent Disability Insurance Benefits Regulations with full knowledge of the corresponding Supplemental Security Income Regulations.

shaky, and she feels like she cannot stand. *Id.* Plaintiff's panic attacks are triggered by flashbacks of times when she was sexually abused. *Id.* at 97.

Plaintiff sometimes hears voices. *Id.* at 90. Seroquel helps but she still hears voices two to three times per week. *Id.* She explained, "it's like I'm hearing somebody tell me I need to go kill myself. I'm not worth anything." *Id.* Plaintiff was admitted to the hospital approximately six years before the hearing because she had tried to kill herself. *Id.* At the time of the hearing, Plaintiff had not had any suicidal thoughts in a month—since her doctor increased her dosage of Seroquel. *Id.* at 98. Before the increase, she had suicidal thoughts "a couple times a month." *Id.*

Additionally, Plaintiff has insomnia. *Id.* at 86. She is able to sleep on some days, but then she may not sleep for three days in a row. *Id.* She takes Doxepin, but it does not always help. *Id.* When she cannot sleep, it is usually because her mind is racing. *Id.* Plaintiff also has nightmares: "I just have nightmares about being killed, something [bad] happening to me [], and then a lot of times in my dreams it's like the abuser in my dream that abused me when I was young telling stuff like I'm not worth anything, you know. I'm just a piece of -- you know what I mean?" *Id.* at 97.

In the past, Plaintiff struggled with addiction to prescription medication such as Percocet and Oxycodone. *Id.* at 94. At the time of the hearing, she had been clean for two years. *Id.* at 95.

Plaintiff has had four surgeries in three years because of issues with her stomach/abdomen. *Id.* at 85. She still has swelling and pain in her stomach that she was planning to see a specialist about. *Id.* She has pain every day but the intensity and

duration varies. *Id.* at 86. Plaintiff has pain medication but her friend holds onto it for her, and she only takes it when she "absolutely [has] to." *Id.* at 94.

Plaintiff lives in a house with a family friend. *Id.* at 81. Plaintiff sometimes sweeps, mops, and washes dishes. *Id.* There are some days—about three days per week—when she does not get out of bed. *Id.* at 92, 95. As a result, she sometimes does not take care of her hygiene. *Id.* at 92. She has good days two to three times per week: "I consider a good day getting up, getting in the shower, eating, taking a walk, reading a book." *Id.* at 95-96. She has a television but she does not watch it very often. *Id.* at 92. Although she reads, she does not remember what she read. *Id.* at 96. She described her memory as "horrible." *Id.* She cannot remember things that happened a couple days before. *Id.* She also has trouble staying focused; she gets distracted easily. *Id.* She often starts things but then forgets about them and does not complete them. *Id.* at 97.

Plaintiff has one friend that she sees once or twice a week. *Id.* at 93. Her friend takes her to get groceries. *Id.* Plaintiff only leaves her house to go out in public once a week. *Id.* at 98. She never leaves by herself. *Id.* It is "very difficult" for Plaintiff to go out into public: "I'm just scared that somebody is going to try to hurt me or I'm just paranoid that somebody is going to try to hurt me." *Id.* at 93.

Plaintiff has two children. *Id.* at 82. Both live with their fathers. *Id.* Plaintiff has visitation rights "but they don't let me see my kids because they think that I'm going to hurt them or something because of my mental disabilities." *Id.* Plaintiff does not have a driver's license. *Id.* at 83.

Plaintiff last worked as a cashier at a tobacco store at least two years before the hearing. *Id.* at 84. She was let go because she "made a $500 mistake." *Id.* She explained that she "didn't charge the right amount [for] a product because [she] forgot the change …." *Id.* Plaintiff testified that she had trouble working because "I was getting paranoid around people coming in because I always worked like in the public, and I don't do good around a lot of people plus my memory is really bad, and I was forgetting things that I should have been doing." *Id.* at 85.

## B. Medical Opinions

### i. Sunita Agarwal, M.D.

On March 18, 2014, Dr. Agarwal, Plaintiff's treating psychiatrist, opined, "She is unable to work indefinitely. She is advised to rest." (Doc. #6, *PageID* #432).

Dr. Agarwal completed a questionnaire regarding Plaintiff's mental residual functional capacity on October 6, 2014. *Id.* at 435-37. She opined Plaintiff was extremely impaired in her ability to relate to the general public and maintain socially appropriate behavior and to perform at production levels expected by most employers. *Id.* at 435-36. She was markedly impaired in most remaining areas, including, for example, her ability to work in coordination with or in proximity to others without distracting them or exhibiting behavioral extremes; to process subjective information accurately and use appropriate judgment; to maintain attention and concentration for more than brief periods of time; to remember locations, workday procedures and instructions; and to behave predictably, reliably, and in an emotionally stable manner. *Id.*

Dr. Agarwal opined Plaintiff would likely have five or more unscheduled absences from work per month due to her conditions and/or side effects of medication. *Id.* at 437. Further, "her condition will deteriorate with any kind of job pressure. *Id.*

### ii.     Aracelis Rivera, Psy.D., & Roseann Umana, Ph.D.

Dr. Rivera reviewed Plaintiff's records on January 16, 2014. *Id.* at 109-22. She found Plaintiff had four severe impairments: disorders of the female genital organs; affective disorders; anxiety disorders; and drug, substance addiction disorders. *Id.* at 115. She had a moderate restriction of activities of daily living; difficulties in maintaining social functioning; and difficulties in maintaining concentration, persistence, or pace. *Id.* She has no repeated episodes of decompensation. *Id.* Dr. Rivera opined Plaintiff "would have some difficulty with sustained concentration secondary to her symptoms. She can complete 3-4 step work tasks that are routine in nature." *Id.* at 118-19. Further, Plaintiff is "[c]apable of work that requires no more than occasional and superficial interactions with the general public, co-workers and supervisors. … [Plaintiff] is capable of performing work-related tasks in situations where duties are relatively static and changes can be explained." *Id.* at 119.

On April 20, 2014, Dr. Umana reviewed Plaintiff's record and confirmed Dr. Rivera's assessment. *Id.* at 139-49.

## IV.    The ALJ's Decision

As noted previously, it fell to ALJ Chaykin to evaluate the evidence connected to Plaintiff's application for benefits. He did so by considering each of the five sequential

steps set forth in the Social Security Regulations. *See* 20 C.F.R. § 404.1520. He reached

the following main conclusions:

Step 1:     Plaintiff has not engaged in substantial gainful employment since May 31, 2011.

Step 2:     She has the severe impairments of disorders of the female genital organs, and affective, mood, and anxiety disorders.

Step 3:     She does not have an impairment or combination of impairments that meets or equals the severity of one in the Commissioner's Listing of Impairments, 20 C.F.R. Part 404, Subpart P, Appendix 1.

Step 4:     Her residual functional capacity, or the most she could do despite her impairments, *see Howard v. Comm'r of Soc. Sec.*, 276 F.3d 235, 239 (6th Cir. 2002), consists of "medium work … including lifting and carrying up to 50 pounds occasionally and 25 pounds [frequently], and sitting up to 6 hours and standing/walking up to 6 hours during an 8-hour workday, subject to the following additional limitations: (1) no exposure to dangerous hazards, such as unprotected heights or dangerous equipment; (2) limited to simple, routine, repetitive tasks that do not involve production rate[,] pace or strict quotas; (3) no more than simple instructions and simple work-related decisions in a static environment with few changes in work setting; (4) no more than occasional interaction with coworkers and supervisors and no interaction with the public; (5) the individual would be expected to be off task approximately 5% of the workday in addition to normal breaks."

Step 4:     She has no past relevant work.

Step 5:     She could perform a significant number of jobs that exist in the national economy.

(Doc. #6, *PageID* #s 47-63). These main findings led the ALJ to ultimately conclude that

Plaintiff was not under a benefits-qualifying disability. *Id.* at 62.

## V.    Discussion

Plaintiff contends that the ALJ failed to properly evaluate her treating

psychiatrist's opinion and that an updated medical opinion is needed.  The Commissioner

maintains that the ALJ properly weighed the opinion evidence and substantial evidence

supports the ALJ's residual functional capacity finding.

### A.    Medical Opinions

Social Security Regulations require ALJs to adhere to certain standards when

weighing medical opinions.  "Key among these is that greater deference is generally

given to the opinions of treating physicians than to those of non-treating physicians,

commonly known as the treating physician rule."  *Rogers,* 486 F.3d at 242 (citations

omitted).  The rule is straightforward:

> Treating-source opinions must be given "controlling weight"
> if two conditions are met: (1) the opinion "is well-supported
> by medically acceptable clinical and laboratory diagnostic
> techniques"; and (2) the opinion "is not inconsistent with the
> other substantial evidence in [the] case record."

*Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 376 (6th Cir. 2013) (quoting in part 20

C.F.R. § 404.1527(c)(2)); *see Gentry*, 741 F.3d at 723.

If the treating physician's opinion is not controlling, "the ALJ, in determining how

much weight is appropriate, must consider a host of factors, including the length,

frequency, nature, and extent of the treatment relationship; the supportability and

consistency of the physician's conclusions; the specialization of the physician; and any

other relevant factors."  *Rogers*, 486 F.3d at 242 (citing *Wilson*, 378 F.3d at 544).

The Regulations also require ALJs to provide "good reasons" for the weight placed upon a treating source's opinions. *Wilson*, 378 F.3d at 544. This mandatory "good reasons" requirement is satisfied when the ALJ provides "specific reasons for the weight placed on a treating source's medical opinions." *Id.* (quoting Soc. Sec. R. 96-2p, 1996 WL 374188, at *5 (Soc. Sec. Admin. July 2, 1996)).[3] The goal is to make clear to any subsequent reviewer the weight given and the reasons for that weight. *Id.* Substantial evidence must support the reasons provided by the ALJ. *Id.*

In the present case, ALJ Chaykin concluded, "given the overall record, the lack of explanation for [her] rather dire assessment, and the lack of overall credibility in [Plaintiff's] allegations, Dr[.] Agarwal's opinion and assessments are not entitled to controlling or deferential weight." (Doc. #6, *PageID* #61). Further, "[her] opinion is not entitled to great or significant weight because it conflicts with other substantial evidence in the case record and is unsupported by the majority of [her] treatment notes. Therefore, [her] opinion is entitled to minimal, if any, weight …." *Id.*

ALJ Chaykin's conclusions appear to refer to the two conditions of the treating physician rule. And, ALJ Chaykin also provided a few additional reasons for the weight he assigned. He does not, however, clearly delineate his reasons for not giving the opinion controlling weight under the treating physician rule from his reasons for giving the opinion less weight under the factors. This alone constitutes error as "these factors are properly applied only after the ALJ has determined that a treating-source opinion will

---

[3] Soc. Sec. R. 96-2p was rescinded by FR vol. 82, No. 57, p. 15263, effective March 27, 2017. At the time of the ALJ's decision in this case, Soc. Sec. R. 96-2p was still in effect.

not be given controlling weight." *Gayheart,* 710 F.3d at 376 (citing 20 C.F.R. § 404.1527(c)(2)). But, if these reasons constitute "good reasons" and are supported by substantial evidence, then this error may be harmless.

ALJ Chaykin first discounts Dr. Agarwal's opinion because she did not provide an explanation for her opinion that Plaintiff was unable to work indefinitely. *Id.* The Commissioner contends, "The ALJ did not give this statement any weight because the decision of whether a person is disabled or employable requires application of law to fact, and accordingly, is a determination that is reserved for the Commissioner." (Doc. #9, *PageID* #552) (citing Soc. Sec. R. 96-5p, 1996 WL 374183, at *2 (Soc. Sec. Admin. July 2, 1996)).[4]

Although the Commissioner is correct that treating source opinions on issues reserved to the Commissioner are not entitled to controlling weight or special significance, "opinions from any medical source on issues reserved to the Commissioner must never be ignored." Soc. Sec. R. 96-5p, 1996 WL 374183, at *2-3. In evaluating a similar statement by an ALJ, the Seventh Circuit emphasized,

> The pertinent regulation says that "a statement by a medical source that you are 'disabled' or 'unable to work' does not mean that you are disabled." 20 C.F.R. § 404.1527(e)(1). That's not the same thing as saying such a statement is improper and therefore to be ignored, as is further made clear when the regulation goes on to state that "the *final* responsibility for deciding" residual functional capacity (ability to work—and so whether the applicant is disabled) "is reserved to the Commissioner." 20 C.F.R. § 404.1527(e)(2).

---

[4] Soc. Sec. R. 96-5p was rescinded by FR vol. 82, No. 57, p. 15263, effective March 27, 2017. At the time of the ALJ's decision in this case, Soc. Sec. R. 96-5p was still in effect.

> And "we will not give any *special* significance to the source
> of an opinion on issues reserved to the Commissioner." 20
> C.F.R. § 404.1527(e)(3).

*Bjornson v. Astrue,* 671 F.3d 640, 647-48 (7th Cir. 2012) (emphasis in original).  Thus,

the fact that Dr. Agarwal provided her opinion about Plaintiff's inability to work does not

properly serve as a valid ground for placing little weight on Dr. Agarwal's opinion.

Additionally, ALJ Chaykin accurately observed that Dr. Agarwal "did not provide

any explanation for the marked and extreme impairment [she] noted in [her] residual

functional capacity."  (Doc. #6, *PageID* #61).  While Dr. Agarwal did complete the

assessment form, there were very few questions that requested explanations.

Nevertheless, the ALJ does not appear to consider that Dr. Agarwal's treatment notes

provide the explanation missing from the opinion.  *See* 20 C.F.R. § 404.1527(b) ("In

determining whether you are disabled, we will always consider the medical opinions in

your case record together with the rest of the relevant evidence we receive.").

Importantly, it can be considerably more difficult to substantiate psychiatric

impairments by objective laboratory testing:

> [W]hen mental illness is the basis of a disability claim,
> clinical and laboratory data may consist of the diagnosis and
> observations of professionals trained in the field of
> psychopathology.  The report of a psychiatrist should not be
> rejected simply because of the relative imprecision of the
> psychiatric methodology or the absence of substantial
> documentation, unless there are other reasons to question the
> diagnostic techniques.

*Blankenship v. Bowen,* 874 F.2d 1116, 1121 (6th Cir. 1989) (citing *Poulin v. Bowen,* 817 F.2d 865, 873-74 (D.C. Cir. 1987), quoting *Lebus v. Harris,* 526 F.Supp. 56, 60 (N.D. Cal. 1981)).

Dr. Agarwal's notes—both before and after she completed Plaintiff's assessment—detail her observations from more than year of treating Plaintiff, and there are no reasons to question her diagnostic techniques.  For example, Dr. Agarwal regularly noted that Plaintiff's affect was defensive and guarded, her mood was depressed and anxious, and she had limited insight and judgment.  (Doc. #6, *PageID* #s 441-42, 444-45, 448, 451).  Further, Plaintiff reported paranoid thoughts and that she was afraid to go outside.  *Id.* at 441, 444, 450.  These notes support—for instance—Dr. Agarwal's opinions concerning social interaction.  Specifically, Dr. Agarwal opined Plaintiff was markedly impaired in her ability to accept instruction from or respond appropriately to criticism from supervisors; work in coordination with or in proximity to others without distracting them or exhibiting behavioral extremes; and respond appropriately to co-workers.  *Id.* at 425.  Dr. Agarwal's notes provide explanations the ALJ ignored.

The ALJ further found that Dr. Agarwal's opinion that Plaintiff "would deteriorate under the stress of working" was based Plaintiff's "subjective and unsupported statement that she lost jobs in the past due to forgetting job duties and her job description."  *Id.* at 61.  In response to the question, "Is the patient's condition likely to deteriorate if … she is placed under stress, particularly the stress of an 8 hour per day, 5 day per week job?" Dr. Agarwal checked "yes."  *Id.* at 427.  The questionnaire then prompts:  "If yes, please indicate why and if this has occurred in the past."  *Id.*  Dr. Agarwal noted, "[Patient]

states in the past she would forget her job duties [and] made frequent mistakes [and] lost her job." *Id.* Dr. Agarwal also later noted, "It is my opinion that her condition will deteriorate with any kind of job pressure." *Id.*

It is not reasonable for the ALJ to assume that Dr. Agarwal based this conclusion *solely* on Plaintiff's subjective statements because physicians are trained to both consider and investigate subjective reports as opposed to blindly accepting them on face value and because Dr. Agarwal did not indicate that she relied *only* on Plaintiff's subjective reports. At the time of the assessment, she had been treating Plaintiff for almost a year. During that time, she regularly indicated Plaintiff's insight and judgment were limited, she was easily distracted, her mood was anxious, her affect was defensive/guarded, and she experienced auditory hallucinations. *Id.* at 438-55, 496-526. All of these observations support Dr. Agarwal's opinion.

Further, to the extent Dr. Agarwal did rely on those statements, they appear to be supported by her inconsistent yearly earnings. For example, she made $3361.64 in 2009, $46.25 in 2010, $7302.57 in 2011, and nothing in 2012-2014. *Id.* at 256. Plaintiff's testimony is also consistent. She explained she was once fired for giving the wrong amount of change and that she had a really bad memory and at work, she often forgot what she was supposed to be doing. *Id.* at 84.

Next, ALJ Chaykin questions how Dr. Agarwal could opine that Plaintiff's condition has stayed the same since May 31, 2011 when she did not begin treating Plaintiff "until late 2013 and there are no records of psychological or psychiatric treatment prior [to] seeking treatment with Clark County Mental Health." *Id.* at 61.

Plaintiff disagrees, asserting that records from Mental Health Services for Clark County show she was treated by Clark County in 2011. (Doc. #9, *PageID* #555) (citing Doc. #6, *PageID* #413). The Commissioner calls this assertion by Plaintiff "a gross overstatement of what the evidence actually shows." (Doc. #9, *PageID* #555).

The Commissioner, however, is incorrect. As noted by Plaintiff, a psychosocial addendum from September 2013 indicates that she was last assessed in November 2011. (Doc. #6, *PageID* #413). But, that is not the only evidence. The same assessment also states that Plaintiff has received outpatient treatment through Mental Health Services for Clark County in 2006, 2011, and 2012. *Id.* at 414. Despite the fact that she was "only seen on several occasions," Plaintiff "has been [diagnosed] with bipolar D/O, PTSD, Depressive D/O NOS, has been seen by psychiatry[,] and had been [prescribed] Remeron, Seroquel, Ambien and Ativan in the past." *Id.* And, the Social Security Administration's initial determination reveals that "Mental Health [Services] of Clark [County] sent a 11/11 LSW Psychosocial Assessment …." *Id.* at 114. Taken together, this evidence establishes that Plaintiff's treatment at Mental Health Services for Clark County did not begin in 2013, and instead, dates back to 2006.

ALJ Chaykin further discounts Dr. Agarwal's opinion because, "although Dr[.] Agarwal indicates the claimant experiences marked and extreme functional limitations and symptoms; were that the case, it is reasonable to assume that Dr[.] Agarwal would recommend, or [Plaintiff] would seek, more intensive treatment than simply attending counseling sessions with a therapist and psychiatric sessions approximately every six weeks." *Id.* at 61. Notably, however, Plaintiff's treatment was not limited to counseling

and psychiatric sessions. Plaintiff's treatment also includes multiple psychiatric medications—Ativan, Doxepin, and Seroquel. *Id.* at 438-55, 496-526. And, her dosage of each has increased significantly and continues to change. *Id.* For example, between March 2014 and April 2015, Plaintiff's prescription for Ativan 2 mg doubled (from one per day to two), Doxepin quadrupled (25 mg to 100 mg), and Seroquel XR octupled (50 mg to 400 mg). *Id.* at 455, 494.

Further, there are no medical opinions in the record that suggest Plaintiff's mental-health treatment is inconsistent with the severity of her mental impairments. The ALJ is not a physician or psychiatrist, and it is not his responsibility to determine what treatment would be appropriate for an individual with certain limitations—even when those limitations are extreme. "[A]n ALJ 'may not substitute his own medical judgment for that of the treating physician where the opinion of the treating physician is supported by the medical evidence.'" *Simpson v. Comm'r of Soc. Sec.*, 344 F. App'x 181, 194 (6th Cir. 2009) (quoting, in part, *Meece v. Barnhart,* 192 F. App'x 456, 465 (6th Cir. 2006)) (citing *Rohan v. Chater*, 98 F.3d 966, 970 (7th Cir. 1996) ("ALJs must not succumb to the temptation to play doctor and make their own independent medical findings")).

The few reasons provided by the ALJ for rejecting Dr. Agarwal's opinion are not supported by substantial evidence and do not amount to "good reasons" for discounting this treating psychologist's opinion. The Sixth Circuit "has made clear that '[w]e do not hesitate to remand when the Commissioner has not provided 'good reasons' for the weight given to a treating physician's opinion and we will continue remanding when we encounter opinions from ALJ's that do not comprehensively set forth the reasons for the

weight assigned to a treating physician's opinion.'" *Cole v. Astrue*, 661 F.3d 931, 939 (6th Cir. 2011) (quoting *Hensley v. Astrue,* 573 F.3d 263, 267 (6th Cir. 2009); *see Bowen*, 478 F.3d at 746 ("[A] decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right." (citing *Wilson,* 378 F.3d at 546-47)).

Moreover, ALJ Chaykin overlooks or ignores some of the factors. He did not—for example—acknowledge that Dr. Agarwal had treated Plaintiff for almost a year—and had seen her eight times—when she completed her assessment. *See* 20 C.F.R. § 404.1527(c)(2)(i) ("When the treating source has seen you a number of times and long enough to have obtained a longitudinal picture of your impairment, we will give the medical source's medical opinion more weight than we would give it if it were from a nontreating source."). During that time period, Plaintiff also saw a counselor at Mental Health Services for Clark County. *See* 20 C.F.R. § 404.1527(c)(2)(ii) ("Generally, the more knowledge a treating source has about your impairment(s) the more weight we will give to the source's medical opinion."). And, Dr. Agarwal, as a psychiatrist, specializes in mental health. *See* 20 C.F.R. § 404.1527(c)(5) ("We generally give more weight to the medical opinion of a specialist about medical issues related to his or her area of specialty than to the medical opinion of a source who is not a specialist.").

In contrast to the "minimal, if any, weight" the ALJ assigned to Plaintiff's treating psychologist's opinion, he concluded that the opinions of State agency reviewing psychological consultants, Dr. Rivera and Dr. Umana, were entitled to "great weight"

because they "are consistent with the overall evidence of record and the record supports the … mental restrictions set forth in those determinations." (Doc. #6, *PageID* #60).[5] The ALJ provides no further explanation for the weight he assigned to their opinions. This constitutes error because "[u]nless a treating source's opinion is given controlling weight, the administrative law judge must explain in the decision the weight given to the opinions of a State agency medical or psychological consultant…." 20 CFR § 404.1527(e)(2)(ii).

In addition, the ALJ erred by failing to apply the same level of scrutiny to reviewing psychologists' opinions as he applied to treating source's opinion. *See Gayheart,* 710 F.3d at 379 (citing 20 C.F.R. § 404.1527(c); Soc. Sec. R. 96-6p, 1996 WL 374180, at *2 (July 2, 1996))[6] ("A more rigorous scrutiny of the treating-source opinion than the nontreating and nonexamining opinions is precisely the inverse of the analysis that the regulation requires."). The ALJ does not acknowledge that Dr. Rivera and Dr. Umana reviewed Plaintiff's records prior to most of Dr. Agarwal's treatment of Plaintiff and prior to Dr. Agarwal's assessment. The ALJ also seems to overlook that both psychologists found that Plaintiff's substance addiction disorder was a severe impairment. (Doc. #6, *PageID* #s 115, 142). And, while the ALJ heavily criticizes Dr.

---

[5] The ALJ also indicates that his "conclusions are consistent with the opinions of the State Agency psychological consultants, whose opinions are entitled to great weight because they are well supported by the overall evidence, including the exaggeration of symptoms by [Plaintiff]." (Doc. #6, *PageID* #58).

[6] The Social Security Administration issued Soc. Sec. R. 17-2p, effective March 27, 2017, which supersedes Soc. Sec. R. 96-6p. At the time of the ALJ's decision in this case, Soc. Sec. R. 96-6p was still in effect.

Agarwal's opinion for a lack of explanation, the ALJ said nothing of the record-reviewing psychologists' limited explanations.

Accordingly, for the above reasons, Plaintiff's Statement of Errors is well taken.[7]

**B.     Remand**

A remand is appropriate when the ALJ's decision is unsupported by substantial evidence or when the ALJ failed to follow the Administration's own regulations and that shortcoming prejudiced the plaintiff on the merits or deprived the plaintiff of a substantial right. *Bowen*, 478 F.3d at 746. Remand may be warranted when the ALJ failed to provide "good reasons" for rejecting a treating medical source's opinions, *see Wilson*, 378 F.3d at 545-47; failed to consider certain evidence, such as a treating source's opinions, *see Bowen*, 478 F.3d at 747-50; failed to consider the combined effect of the plaintiff's impairments, *see Gentry*, 741 F.3d at 725-26; or failed to provide specific reasons supported by substantial evidence for finding the plaintiff lacks credibility, *see Rogers*, 486 F.3d at 249.

Under sentence four of 42 U.S.C. § 405(g), the Court has authority to affirm, modify, or reverse the Commissioner's decision "with or without remanding the cause for rehearing." *Melkonyan v. Sullivan*, 501 U.S. 89, 99 (1991). Consequently, a remand under sentence four may result in the need for further proceedings or an immediate award of benefits. *E.g., Blakley*, 581 F.3d at 410; *Felisky v. Bowen*, 35 F.3d 1027, 1041 (6th Cir. 1994). The latter is warranted where the evidence of disability is overwhelming or

---

[7] In light of the above discussion, and the resulting need to remand this case, an in-depth analysis of Plaintiff's other challenges to the ALJ's decision is unwarranted.

where the evidence of disability is strong while contrary evidence is lacking. *Faucher v. Sec'y of Health & Human Servs.*, 17 F.3d 171, 176 (6th Cir. 1994).

A judicial award of benefits is unwarranted in the present case because the evidence of disability is not overwhelming and the evidence of disability is not strong while contrary evidence is lacking. However, Plaintiff is entitled to an Order remanding this case to the Social Security Administration pursuant to sentence four of § 405(g) due to the problems discussed above. On remand, the ALJ should be directed to evaluate the evidence of record, including the medical source opinions, under the applicable legal criteria mandated by the Commissioner's Regulations and Rulings and by case law; and to evaluate Plaintiff's disability claim under the required five-step sequential analysis to determine anew whether Plaintiff was under a disability and whether her applications for Disability Insurance Benefits and Supplemental Security Income should be granted.

## **IT IS THEREFORE RECOMMENDED THAT**:

1.     The Commissioner's non-disability finding be vacated;

2.     No finding be made as to whether Plaintiff Amber N. Brandenburg was under a "disability" within the meaning of the Social Security Act;

3.     This matter be **REMANDED** to the Social Security Administration under sentence four of 42 U.S.C. § 405(g) for further consideration consistent with this Report and Recommendations, and any decision adopting this Report and Recommendations; and

4.     The case be terminated on the Court's docket.


Date:  December 15, 2017                    *s/Sharon L. Ovington*
                                            Sharon L. Ovington
                                            United States Magistrate Judge

## NOTICE REGARDING OBJECTIONS

Pursuant to Fed. R. Civ. P. 72(b), any party may serve and file specific, written objections to the proposed findings and recommendations within **FOURTEEN** days after being served with this Report and Recommendations.  Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum of law in support of the objections.  If the Report and Recommendation is based in whole or in part upon matters occurring of record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs.  A party may respond to another party's objections within **FOURTEEN** days after being served with a copy thereof.

Failure to make objections in accordance with this procedure may forfeit rights on appeal.  *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947, 949-50 (6th Cir. 1981).